case number 19-3074 United States of America versus Patricia Driscoll appellants. Mr. Stolarz for the appellant, Mr. Smith for the appellee. Good morning, Mr. Stolarz. We'll hear from you. Thank you, Your Honor. Good morning. May it please the court. Brian Stolarz for Appellant Patricia Driscoll. First off, I want to thank the court personnel for the very helpful manner in which we're doing this virtual court. Thank you very much to the court. Your Honor, in 1935, the Supreme Court stated that a prosecutor may strike hard blows, but he's not at liberty to strike foul ones. That platitude gets thrown around a lot. This case is the embodiment of it. This whole case was broken from the very beginning due to misconduct by the investigative agent that was compounded by misconduct by the prosecutor who sought to cover for that agent. And the only way this kind of misconduct doesn't happen again is accountability. As a criminal defense lawyer, I hear things like accountability and deterrence all the time. And yet here we are, the government doing this conduct, and there's no accountability. The agent in this case took the Constitution into his own hands. He sees an exciting new case on a sports website. He's a brand new agent. The district court called it the Moby Dick, the white whale case. He hears she is testifying in her child custody hearing where the child will spend holidays and school. He admits he knows less than 5% of the case and wants his case badly. The prosecutor agrees that the agent, Agent Valdini, should go to the child custody hearing, and here mistress will testify. It was a team decision. Prosecutor tells him, though, Don't badge in. Don't get a badge. Still unsure what that means, but there's no formal covert operation plan approved. The prosecutor admitted it. Yes, sir. I'm assume I'm sold on everything you've said. Too much sold that there was prosecutorial misconduct here. Can you explain why there was Brady prejudice? Why? Why should we reverse the case when you ultimately got all the information in time to use it in trial? And in particular, I would ask, Do you know of any one case from the D. C. Circuit where the D. C. Circuit has reversed a district court guilty verdict on the grounds of Brady when the Brady material was in the hands of the defense, at least by the time the defense began its case in chief? Thank you, Your Honor. And thank you for that question. I believe the court tried valiantly to remedy this trial during for the Brady evidence, and there's two reasons why it was insufficient. One Brady remedy cannot remedy a lying government witness. Uh, agent Valdini was very specific to where and how this case came out. We received the Brady. The judge called a mini trial during the trial, and during that mini trial, the agent testified outside the presence of the jury and didn't do well. Realize he had been caught, and by the time he testified in front of the jury, he cleaned it all up. And I can't. There's nothing as a defense lawyer that I could do to remedy that. He said, for example, in front of the jury, he got consent from a supervisor to conduct surveillance. Well, that made it look more official. That had never been given to me before. I was blindsided the entire time. I did the best I could with it, but that's not the stand. All these are all these arguments you're making. You were able to make jury in order to hurt his credibility. That is absolutely correct. Yes, Your Honor. I did. So is there an answer to my my kind of yes or no question on? Do you have a D. C. Circuit case that reverses a district court conviction with Brady evidence in question? Did make it did make its way into the hands of the least before the defense began a taste. No, Your Honor, I don't. And the judge notice noted that which said that prosecutor was lucky that I got it when I got it. If I got in a week later, two weeks later would be in a different posture, and I fully acknowledge that. But I believe you earn. This is bigger than Brady. I believe this case was fundamentally broken from the very beginning. So even if you take a step behind Brady and look to the twill case, which is the best I can find in Fifth Circuit, I realized there's limitations in that case. It's a Fourth Amendment case because you're dealing with a agent who lied in that case about a civil audit and asking the person asked. Is this a criminal audit? Or is there an agent involved? No. And they produced the documents. In this case, Judge, we have the Fifth Amendment being violated. So I think this goes beyond Brady. And that's the point that I really want to stress, which is if the agent sits in a child custody hearing and mistress will goes to him and said, Are you worked for the government? And he says no, he is. Her consent to go up there and testify is gone. So the whole case gets cracked in the very beginning. Yes, I understand about the Brady issue, and I fully understand your point. And I frankly agree with what Judge Leon said. I got it. I don't think I was able to use it effectively, but I got it. But this case was cracked from the very beginning. And Agent Baldini admits this. He said, I did not want it to be overt for mistress to know we're investigating her yet. The only context I know of where you can lie is when you're doing custodial interrogations. Back to my old public defender days, right? So you have to litigate that. There's no context like that here. The court asked who he was, Agent Baldini lies. Mistress will ask who he was, Agent Baldini lies. So his lawyer asked who he was, Agent Baldini lies. He holds the Constitution and says, You know what? I'm gonna take it in my hands such that you can't consult with your lawyer to see if you wanna take a time out and see if you wanna testify or not, such that the judge himself cannot admonish the witness to seek counsel. I mean, that's what I think is somewhat even a bigger question, is what he usurped, not just the role of a defense lawyer who could tell a person, advise them of their constitutional rights... Is there any authority though, that even if he had disclosed that he was a government agent, that the judge at that proceeding had any obligation to warn Ms. Driscoll before she testified? No, I think what I've seen is common practice, and in fact, Judge Leon did that in the district court when one of the witnesses had exposure. But I guess my point is that Ms. Driscoll was testifying. It's an open proceeding. The government or the public or anybody could get a transcript of it, so there's no expectation that she has that whatever she says can't be used against her. Why would we have any expectation of that? Well, you're absolutely right, and there's irony to that. If the government never went, they could have easily gotten a transcript and they could have used whatever she said for their investigative purposes. It's the moment that Agent Baldini inserts himself in the process and lies to her and says, I am not a government agent. It was a point blank question. First day, are you work for the court? No. Second day, he comes back, do you work for the government? He says, no. Therefore, she feels comfortable to testify. So because he inserted himself, Judge. But if he had never showed up, she would have been just as comfortable and would have said this exact same thing and the government could have obtained the transcript and you would have been where you are. I mean, it seems to me that if there's any real misconduct here, it's when, you know, he goes to lunch and, you know, does the other stuff. But I'm just not understanding what constitutional right or or egregious misconduct takes place by him not identifying himself in the courtroom. Well, the best that I could do, Judge, is make the analogy to Twill, which is I acknowledge the limitations of the Fourth Amendment case. In that case, they say, Is there a civil? Is there a criminal audit? No. So they produce documents. In this case, he says, Are you a government agent? If he says yes, then she will consult with her lawyer, but she will. The judge may admonish her. Hey, you might want to get your own criminal defense lawyer, and then she may not testify. But it's Judge Age of El Dini took the constitution in his hands. I can't be permissible. I understand you're allowed to lie to a witness in interrogation, but not in this context. When you are in purposely hiding who you are to make her go and testify, he's going to watch her testify. So in doing that, he is taking the constitution in his hands. Was any of the civil testimony used against her in the criminal trial? Yes, Judge. In fact, the agent admitted he issued subpoenas as a result of what he heard. He knew who to talk to. He knew which witnesses to call, and he knew what her defense was. She was a sitting duck for years. The same defense she used then, I used later in the trial, and it was all out there because he knew about it. So yes, and the government admitted that they made derivative use of the testimony. That's very clear, and I have the assent for it too. It's JA 373. They admitted they made derivative use of the information. So this comes down almost like a fruit of poisonous tree in some ways. If he sits there and lies, and then all these things happen, he writes down, oh, I got a subpoena this bank. Oh, I got a subpoena this person. Oh, I got to take a witness. He's filing the constitution to get his roadmap. In a high profile case, he's a new agent. He's a lawyer, by the way, a new agent desperate for a white whale case. Prosecutors do not supervise him because as to the lunch, which I know I'm running a little short on time, that lunch is preposterous. It's one of the worst things I've ever seen, but yet the prosecutor doesn't inquire about a fourth day memo and then makes the statement they made to the district court. They lied to the district court, and they said that he did not write a memo because nothing happened on that day, JA 254. If I wrote that in a pleading, or Ms. Driscoll wrote that in a pleading, we'd be investigated for obstruction of justice. But yet they can say nothing happened, and that's totally not true. District court denied that. Given the interest of time, do you want to argue about any of your other issues, particularly the jury instruction issue? I can address that during my two minute rebuttal. I mostly rest on the papers on that. The courts flipped the order of the red book, gave an anti deadlock instruction, then gave two others that missed the critical point of holding to your honest convictions, rather than just saying, keep an open mind. Sorry? I'll just ask you one or two questions about that. Yes, your honor. I take it it's not your position that the standard... There are two standard instructions, as far as I can tell, that in some sense are anti deadlock. They are under 2.601 of the red book. And Roman three is the one that's called the Thomas instruction. There's also Roman one, which is called the initial instruction. I take it it's not your position that it would be reversible error to give the initial instruction, because it's materially different from what's called the Thomas instruction. Correct. That is not my position, your honor. And is it your point that in the hypothetical case where the district court starts with the initial instruction at the beginning, on the first deadlock notice early in the trial, he gives the initial instruction, then the jury deliberates more, second deadlock note, then he gives the Thomas instruction. Is that reversible error for giving the same kind of instruction twice? Well, and that's the big debate. The government said they could not... The judge could not give an anti deadlock instruction twice. What's your position on that? I believe you cannot give more than one anti deadlock instruction. And frankly, that's part of the role of this court, because there's a split in the circuits, there's a hodgepodge of wordsmithing during instruction cases that takes up a lot of time to parse each one. There's no clear ruling from this court on whether that can or can't happen. And so I do think that's the role of this court, to give us a firm ruling that you cannot do a repetition of an anti deadlock instruction. Suppose we disagree, as to my hypothetical. What is it about flipping the order? This case is odd because the district court starts with the full blown Thomas instruction the first time, and then uses the Thomas light initial instruction on the third instruction. Why is it worse to flip the order than if he had just done exactly what the Red Book seems to contemplate, which is give the initial instruction first, and then the full Thomas instruction second? Why is that worse? Yes, Your Honor, because the instructions he gave afterwards were functioned as additional Thomas instructions because he omitted critical language. Thomas instruction says the juror must hold their honest convictions. The instructions he gave afterwards were just keep an open mind. He said keep an open mind probably five or six times, but never said hold your honest convictions. So he starts with hold your honest convictions, but does not repeat it, which makes it... And that goes back to Thomas itself, which says we have to look to the functional effect on the jury. We had a holdout juror clearly voting for acquittal, we know now, and the multiple instructions afterwards were guided to that juror, and none of them said hold your honest convictions. It just said keep an open mind. So that is why they're brought with danger. Right, but that is permissible. I mean, that is how the initial instruction is formulated. Correct, but that's why if you would go first to that and then hit a Thomas, then you hit the keep your honest convictions. And if he were to say keep your honest convictions every time, that lone holdout juror for acquittal may have done exactly that, but he didn't. I believe he was coerced in pressure. Thank you. Thank you. So can I get clarification? You're saying you're now saying it is all right to give the initial instruction on one day and then the Thomas instruction on another day. Right, no, I didn't, you know, I'm not... I don't believe I claim that as error that you... He did flip it, and I believe that the functional effect of the totality of the jury instructions was wrong, but the Red Book is... The Red Book is, I believe, supposed to go first then second, the pre-Thomas to the Thomas. Right, and so if you go second and then first, instead of first and second, what's the difference? Why does that matter? Well, Your Honor, as I just explained, when you go from the big heavy one to the light one, if you don't have the themes from the heavy one, which is hold your honest convictions, then the jurors are confused, and the totality is, well, maybe I don't have to hold my convictions anymore. Maybe I just have to keep an open mind. So that was directed towards that one juror. It was coercive. The totality was lay it down so that litigants and judges can know... The government said, you can't do a second anti deadlock. The judge said, I could. So therefore, there needs to be a set thing that we could all have a level playing field to know what to do. There's a case, United States v. Black, from this court in 1988. I'm gonna read the additional instruction that the court gave there, and this is not a trick question. I'll tell you right now, the DC Circuit said that this additional instruction was not an additional Thomas charge. It's not the same as saying Thomas twice or saying Thomas light and leaving out something that's got to be in Thomas. So here's the additional instruction. I'll now instruct you in response to your question that each juror is entitled to his or her opinions. Each should, however, exchange views with his or her fellow jurors. That is the very purpose of jury deliberations, to discuss and consider the evidence, to listen to the arguments of the fellow jurors, to present your individual views, to consult with one another, and to reach an agreement based solely and wholly on the evidence, if you can do so without violence to your own individual judgment. That seems very similar to what the District Court judge here said in his final instruction to the jury. Yes, Your Honor, I think the answer to that is the end part you just mentioned about without doing violence to your own convictions, I believe that the later instructions by Judge Leon stressed open mind rather than holding your honest convictions. So I agree it's a bit of wordsmithing, and that goes back to my point that it's hard to find, you know, where to put everything because there's so many different types of cases. The wordsmithing to individual judges and litigants is very challenging, but I believe that he did not stress holding your own convictions as well as Buzz Black did in that case. And he did say open mind, you know, over and over and over again. I agree with you on that. It just, to me, seems like such a, almost a truism of a thing for a judge to tell the jury. I mean, their job is to keep an open mind. He might as well just said do your job four times. It's, you know, banal. It seems almost like it's a banal suggestion. It just doesn't strike me as anything that would coerce anyone. So tell me why I'm wrong. No, I'm not saying you weren't. I mean, it's a very valid point, Judge. The point, though, is in this particular factual instance, which is why all these cases are so difficult to reconcile, you have a deadlocked juror who told the judge that he's deadlocked, he's made up his mind. The fact that he doesn't tell that one holdout juror, we know we're dealing with one holdout juror, we now know for acquittal. Telling that one holdout juror to keep an open mind and not also telling that holdout juror to hold your honest convictions, that's the problem. Because we know it's one with a holdout. We don't know at the time which one it was, which way he was going or she was going. So that's why it's wrong. Because it's targeting a juror with coercive language, keep it up in mind, but not also telling that juror, hey, if you still feel that way, you should keep feeling that way. That's the only splice that I have for you. Thank you all very much. Are there any other questions? No, thanks. All right, we'll hear from the government. Thank you. May it please the court. Peter Smith on behalf of the United States. I'd like to take the arguments in the order that they were addressed this morning by the court, starting with Appellant's Brady argument. The district court did not abuse its discretion in denying relief on Appellant's Brady claim. The main claim that Appellant presented this morning was that he could have better impeached Agent Valdini had he had more time to do so. And at bottom, our argument is that there simply isn't any materiality to this argument. Appellant had multiple opportunities to question Agent Valdini under oath. The court gave him a wide berth to do so. And there's no indication that any additional or better impeachment would entitle Appellant to the Brady standard, which is essentially that you would achieve a different outcome at trial. Appellant, this morning, in oral argument and perhaps in reply, is raising a new argument, an argument he characterizes, counsel characterizes as a Fifth Amendment argument. And this court shouldn't consider that argument because it is new in reply or on in the oral argument. In the district court and in his opening brief, Appellant made this Fifth Amendment argument as an aspect of materiality. He said he was raising a Brady, she said she was raising a Brady claim and that an aspect of why the Brady, alleged Brady violation was material was that she either might not have testified or testimony might have been different if she had known about Agent Valdini's presence. And then I just have a couple of quick points about that. Appellant knew going in that this was a public proceeding. She didn't ask about Agent Valdini's identity until three hours into her testimony during the lunch break. And the district court made a factual finding that Appellant's testimony at the child custody hearing hadn't been induced by the government or altered by the given the lengthy evidentiary hearing the district court held. As I mentioned, the defense had ample opportunity to question Agent Valdini to raise this before the jury and even argued at length to the jury in closing argument that the government's conduct was improper and warranted, you know, an acquittal in the case. Mr. Smith, let me let me ask you a hypothetical. Suppose Valdini had done everything that he did. Suppose the district judge learned of it when the district judge learned of it. And suppose the district judge had said as a remedy for this misconduct, I'm dismissing the case. I could just continue the case to give defense some time to prepare based on the new evidence. I could not do a continuance and just kind of make them play catch-up. But in an extreme instance, in part as a prophylactic to disincentivize law enforcement from playing these tricks in the future, I'm dismissing the case. Do you think that this court could reverse that decision? I guess it depends on the indictment, which I guess is suggested by the court's question. The district court, I mean, is dismissing the indictment. The government would be able to appeal and I think that that would be an abuse of discretion on these facts. There needs to be, in order to have some sort of due process violation and the dismissal of an indictment, truly outrageous, you know, government conduct. And the district... Why is this not truly outrageous? Because the district court initially believed that what the government had done was somehow assist Appellant's ex-husband in the custody case. And the evidence you're hearing bore out that that is not actually what happened. So what Appellant is complaining about is Agent Baldini's presence, about his connections with these various people during the luncheon meeting, but none of that rises to the level of that kind of outrageous conduct that would warrant dismissal. If the facts, as I think Judge Leon found them, are true, Baldini lied to a state judge, Baldini destroyed evidence, the fourth day's notes, Baldini lied to a federal court when he was asked, what did you talk about at the lunch meeting? And you don't think that's outrageous? Well, I guess I think that that is problematic, but I don't think it warrants, wouldn't warrant dismissal of the indictment. And I would add that Appellant has never sought that remedy. So... What's to stop, a future Baldini from doing all of this again, if at the end of the day, it didn't, the government was not penalized for it? Well, the government was penalized for it through the district court's admonitions, through the lengthy Brady hearing, through the fact that a defense counsel was able to raise all of this before the jury, which did in fact penalize the government's case. And I would add on the flip end of this is that, and this also goes to Appellant's derivative use argument, that it's not, this case isn't just about Agent Baldini. Agent, that this was a combined investigation that involved the FBI. The prosecutors were directing the investigation. The prosecutor explained to the district court during the Brady hearing, why there really wasn't any derivative use of information that Agent Baldini had gleaned during the custody hearing. That it, the government never used any statement or never introduced at trial any statement that Appellant made during the hearing. And the prosecutor on November 8th, in the afternoon transcript at pages 60 to 65, explained to the district court why the government hadn't used any of this information to direct its investigation. She explained that they had debriefed Tonya Finch, who was the whistleblower before the child custody hearing, that the, the prosecutors had already done a lot of legwork on the case and already had a game plan for the investigation. And so I would urge the court to look at that transcript reference. And then I would also say that the court, you know, it is an interesting hypothetical, but Appellant simply hasn't raised that claim that would warrant, has never asked for dismissal of the indictment. And therefore this court can't award relief that Appellant has never asked for. If there aren't other questions about the, Judge Katsas, do you have a question? I'm ready to talk about the instructions. The instructions. Okay. So let me ask you about them. If we look at the totality of the circumstances here, you have three different instructions that are in the general ballpark of Thomas. You have the first one, first one looks like a Thomas instruction, but there's a lot of improvising. There's some improvising about how important a unanimous verdict is to the, not just to the parties in the community, but the whole country. The second Thomas-like instruction, that seems like the comments are pretty pointed in the way they are directed to one juror. The court hopes that this juror will come around. And the third instruction, which looks a little bit, it looks a little bit like a Thomas-like instruction, that initial instruction from the Red Book, but it too has a fair amount of improvising with keep an open mind repeated over and over. And that might be a truism in the abstract, but in the context of these jury notes, it sure seems like it's an attempt to bully the one juror. When you put all of that together, why isn't that coercive? I guess I have several different responses, Judge Katsas, if the court would bear with me. At bottom... I asked a lot of different questions, so go ahead. Yeah, so I'm gonna sort of untangle those over time, and I just hope the court allows me an opportunity to fully explain. So first of all, the court's gotta view the context of all of these different instructions and everything that's happening in the district court. Appellant has initially agreed to the giving of the Thomas instruction, so that's part of the context... Agreed. The court has gotta consider. Agreed. And... And there's the improvising. Right. And then as to the improvising, I guess I have a few different points about that. First of all, it would have been clear to the jury that the Thomas instruction had ended because the court told the jury, okay, I've given you these two instructions, you're gonna have them, go ahead and consider them. Of course, I'm paraphrasing. And then the court went on to give what we call in our brief a pep talk, where the court sort of encouraged the jury... A pep talk. A pep talk. A court went on, and the jury would have understood that that was different from the actual legal instructions. They would have recognized that difference, and they would have recognized that as a pep talk, as the court was trying to sympathize with the jury and urge them to keep going. There are, of course, two other factual aspects this court's gotta consider. The jury went back and continued to deliberate for quite a while. It eventually issued partial verdicts, and then still spent additional time before it was finally... Finally issued all of the verdicts in that case. And that sort of shows that no particular instruction was coercive. Then I would add a few other facts this court's gotta consider. The district court acted... When it responded to the first note, and it gave that sort of extemporaneous pep talk, the jury had only been out for one and a half or two hours. That was very early, and judge... The district court looked at that and felt that the instructions were appropriate at that time because the jury had come back so quickly in such a complicated case. And then I guess the final response I would give, Judge Katsos, to your question is that the instructions, the three different instructions, were not coercive because the court... And this goes to the other language and also goes to Appellant's point about not surrendering the juror's honest convictions. So the court several times reminded the jurors to keep an open mind, but it also said that the jurors needed to discuss their views, indicating that the juror who was refusing to deliberate had a view that was important, and that it needed... That juror needed to discuss, and the other jurors needed to discuss with that juror that juror's view. The district court also, in its final instruction, again reminded the jurors that they have to express their own views. And as Judge Walker indicated earlier, referring to the Black case, that is very similar to what the court did in Black. So when you add all those facts together, you add the context where Appellant has asked for the Thomas instruction initially, you have a note that seems process oriented. You have a note where the juror is refusing to follow the court's instructions and is not deliberating. You're adding that is not deliberating. The note says the juror has made up his mind. Yes, and the district court discussed that on the first day before giving the Thomas instruction about the district court's view about what exactly that meant. And the district court found, among other things, that it indicated that the juror wasn't deliberating. But if the district court made that finding, why did the district court give an anti deadlock instruction instead of the part one instruction in kind of an admonishment to just deliberate instruction? Yeah, you can't have it both ways and say, well, this was only an indication that a juror wasn't deliberating when the district court essentially made a finding that there was a deadlock or else you're not supposed to give the Thomas instruction until you've found that there is a deadlock. I mean, I appreciate the court's point. I think the district court found essentially both. But the court needs to bear in mind that the context. How? How can you find both? Well, the context of this court's review of the district court's decision is where the appellant is asking for the court to give the Thomas instruction. He's agreeing with that. And defense counsel saying it's important to come out strong. So that's sort of the background of this court's evaluation of the district court's decision. The district court also thought that the Thomas instruction basically reflected or summarized all the points the district court wanted to make at that time. So he did explain his reasons for giving that instruction at that point. And again, appellant agreed with that. And therefore, that argument, the timing of the instructions and the giving of the Thomas instruction initially, that is waived. And this court shouldn't consider that as an error. I'm not saying that it was error to give the Thomas instruction initially. What I'm saying is that the note said that the juror has made up his mind or his or her mind. Okay. And in response to that, a Thomas instruction is given. There is a second note on the 27th that also says that a juror has his mind made up. And then there's more instructions that are given where, again, the judge departs from the standard language. And then finally, on the 28th, the jurors say, well, we have a partial verdict and we are deadlocked on two counts. So it's reasonable to infer that with respect to each of those three notes, the same juror has made up his mind and is deadlocked. And if you give an instruction that says, keep an open mind after the juror has said, after it's been told to the court three times that this juror has made up his mind, how can that be construed reasonably as anything other than an instruction that you are to basically consider changing your mind, which is kind of the essential aspect of an anti-deadlock instruction, which has to be balanced with language that says, but don't give up your honest conviction. I guess I have two responses, Your Honor. In the notes, there was also, I mean, I agree with Your Honor's point about the juror's mind made up, but the jury note also said that the juror's mind was made up based, and I'm paraphrasing now, essentially regardless of the facts. And that indicates to me that there was a process element to this. I don't recall anything that says regardless of the facts. Well, let's see. He said, first note is, he already had, this is in the transcript of the first jury note, it's page 25. He already has his mind made up and he is not basing his decision on the facts. So I'm just saying the district court and the parties seem to understand that there was some process element to this, that there was a refusal to cooperate and to deliberate. But setting that aside, and I appreciate Your Honor's point, I do have response to that, even if it was a deadlock, even if the court, this court, construes that as a deadlock. The situation isn't that different from Dorsey, cited in the government's brief, where Dorsey says that in that case, a juror was singled out. The court had learned essentially the split among the jurors through a jury poll, and then instructed the jury to go back and deliberate. And this court said that the re-instruction and the instruction was not coercive, and it explained why. And so I think that given the constellation of facts in this case, Dorsey is instructive. And I would, in addition to what I said earlier, I would add a couple of factual points about what happened here. The government's, I mean, the court's instructions to the jury didn't telegraph an outcome. The court told the jury to keep an open mind, but it did also tell the juror his or her mind made up to discuss their view with the others and for the others to what happened in Black and other cases, where this court has affirmed and found that those courts, that those instructions weren't coercive. So, I mean, I understand when you look at it. But I guess, you know, the cases that that you have cited from our circuit, and you cite the McDonald case from the Second Circuit, the court basis of its assessment or its holding, that an instruction that just says, keep an open mind and keep deliberating isn't coercive. It bases that on, on saying that in context, the instruction isn't asking anyone to kind of change their vote, to actually re-examine their views. It's just, you know, telling them that, you know, deliberation is hard, keep at it, etc. You know, the essence of an anti-deadlock instruction that's coercive is either an explicit statement or an implication that somebody who has made up their mind and isn't budging should consider re-examining their views. So my question to you is, when the court is told three times that a that said explicitly twice, and then the third time it said that the jury is deadlocked on at least two counts, which in effect means the same thing, and you basically give an instruction targeting that deadlocked juror, telling him to keep an open mind, putting aside what we've in Thomas and its progeny about, you're supposed to, you know, not depart from the language. But when you tell a holdout juror, who's made clear that they are the holdout, to keep an open mind, why shouldn't we interpret that as tantamount to the juror being told or that the juror would reasonably believe that he was being told, you should consider changing your mind? I guess for several reasons, Your Honor. First of all, the court's instructions did have this other aspect of not only keeping an open mind, but discussing your views and expressing your own point of view, which acknowledges that that juror, the juror who was the subject of the chair. I'd also note that this court's Lope Sierra decision, which is cited in the governance brief, indicates that reminding the jury of an instruction as opposed to rereading the instruction is less coercive. And of course, each time the district court gave one of these instructions, or three different instructions, as you pointed out, Your Honor, the jury continued to deliberate, showing that the juror whose mind was made up didn't immediately, you know, that the instructions weren't unduly coercive, because the juror didn't immediately turn their view around. The jury continued to deliberate, the jury rendered partial verdicts after a couple of days, and on the third, third or fourth day of deliberations, finally reached a the instructions as a whole weren't unduly coercive. What do we do with the fact that the third round of instructing on November the 28th, when the jurors sent a note saying that they had a partial verdict, the court responded with an instruction to keep an open mind. But the court did not, of course, have the language in there about not surrendering honest convictions. And the court also didn't reference the earlier instructions, or remind the jurors of his earlier instructions, including the Thomas instruction that he had given earlier that had the language about not surrendering honest convictions. Right, I agree with that, Your Honor. And I think that our answer is that the, the instruction on that day, the third day, had a component that was similar to Thomas that said that that juror must express their own point of view. And that is, I believe it's in the November 28th transcript at page 15. The court asked the jury to continue the jury to continue deliberations and to keep an open mind, but then said, with a view of listening to others and expressing your own point of view, which is similar. What are we supposed to do with the holding of Thomas and the holding of several cases after Thomas that says that the language of Thomas is what's supposed to be given and that anything else is presumptively coercive and reversible? Yeah, I think the court's, you know, this case is distinguishable from that precedent like Yarborough, where this court said that the district court shouldn't make any substantive departure from Thomas and the court gave the Thomas instruction verbatim. The court then later referred back to the Thomas instruction, but didn't reread it. And then the final instruction that we just discussed, I would say, is not a substantive departure from Thomas. It's consistent with it. It's similar to it. The language isn't exactly the same, but the court was giving an instruction that included both aspects of keeping an open mind, but also expressing each juror's point of view with the view toward listening to what they had to say. Expressing, telling the jurors that you should feel free to speak your point of view to others is nothing like saying don't surrender your own honest convictions solely to reach a verdict or solely because other jurors disagree. I think the point is the same, Your Honor, and I think the jury would have understood it. How is the point the same that you have a right to speak out? That's not the same as the point that you have a right to maintain your convictions. Well, I think it does. Not change your vote if it does violence to your honest conviction to do so. Right, because the court wouldn't, I mean, what I'm saying is that the district court wouldn't be telling the jurors to express their point of view if their point of view didn't have legitimacy or if it weren't important. That's all I'm saying. So that the court is recognizing both aspects. Keep an open mind and deliberate with the others, but also express your point of view, which has value. So you get both aspects there. So I don't think it's a substantive or substantial departure from Thomas. I think it's consistent with Thomas. So that would be my answer to the court's question. And but as to the overall question of whether, you know, reversal is warranted, I would go back to my answer to Judge Katsas and say that the court's got to look at all the instructions together. It's got to look at the entire procedural posture, which includes appellant asking, appellant's counsel asking for the Thomas instruction initially. And it's got to look at each of these notes and what the juror notes said and what the court's response said. And so we think that cases like Dorsey and Black are instructive and that this, the instructions that the district court gave weren't together and duly coercive. They did not coerce that individual juror to change their settled convictions or their honest convictions. Judge Katsas, Judge Walker, do you have any further questions for the government? Just one question. Where's Valdini in terms of, has he received kind of a reprimand by anyone in the executive branch? Oh, I don't know the answer to that question, I'm sorry. The last I knew he was still working at the IRS, but I don't know the answer to that question. All right. Thank you. I'll let you make any closing statement in conclusion. Thank you, your honors. All right. Thank you, Mr. Smith. Mr. Stolarz, you were out of time. I'll give you two minutes for rebuttal. Thank you, your honor. Briefly as to the fifth amendment question that the government said it was just for the Brady materiality, that's with all due respect, plainly false. I filed an independent motion to dismiss. I filed an independent motion for mistrial and a post-trial motion for dismissal based on the fifth amendment issue. So therefore it's not ensconced under the Brady. It's a separate issue where a separate ruling was made. As to the issue about whether or not derivative use was used and the government attempt to sort of take that, you know, downplay that, the government prosecutor herself at JA 373 said the witness testified they did take derivative use of the information they received. That's not in dispute. And I questioned the man and I said, did you issue subpoenas from this? Yes. Did you talk to witnesses because of this? Yes. It was clearly derivative use. He didn't go there to find out where her son was going to spend Christmas. And then finally, as to the jury instructions, I do want to note that the second instruction goes to the court's point about targeting a juror. The second instruction told the juror, I hope you will come around to keeping an open mind. That's directed at one person. Coming around is exactly what he's trying to tell him to do without giving to not surrender his honest convictions. And then the final instruction after the prosecutor verdict was announced, he said, keep an open mind three times, but did not say, hold your honest convictions. Your honor, I do want to end by saying that if this is the way the system works, we're all in trouble. You know, they said they were going to give a talking to like when my kid, you know, spills and spills his drink. Like that's not the response here. There's OPR complaints. I've not heard anything about there, but asked to give statements. Judge Leon said it best. It's a cavalier approach, sloppy and careless. It's about fairness, about conducting the powers of the U.S. government in a fair way against an individual. That's what this is about. There's no, and judge Leon said the attitude of the approach to government has no place in the department of justice. And we agree. Thank you, your honor.
judges: Wilkins, Katsas, Walker